## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## IN NASHVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>Shirley Laughbaum, and the STATE OF<br>TENNESSEE ex rel. Shirley Laughbaum,<br><br>     Plaintiffs,<br><br>v.<br><br>MEHARRY MEDICAL COLLEGE,<br>and JOHN DOES 1-10<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _____<br>)<br>) FALSE CLAIMS ACT COMPLAINT AND<br>) DEMAND FOR JURY TRIAL<br>)<br>) FILED IN CAMERA AND UNDER SEAL<br>) PURSUANT TO 31 USC § 3730<br>) |

---

## FALSE CLAIMS ACT COMPLAINT

---

Plaintiff Shirley Laughbaum ("Laughbaum"), on behalf of the United States of America, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and on behalf of the State of Tennessee, pursuant to the *qui tam* provisions of the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101-108 (the "TFCA"), brings this action against Defendant Meharry Medical College (and its satellite clinics collectively referred to as "MMC"), and John Does 1-10, to recover penalties and damages arising from MMC and John Does 1-10 false statements in violation of the FCA, 31 U.S.C. § 3729 and TFCA, Tenn. Code Ann. §4-18-103. In support thereof, Shirley Laughbaum (the "Relator", "Qui Tam Plaintiff", or "Laughbaum") alleges as follows:

## I.     INTRODUCTION

1.     In the course of her employment with MMC, Laughbaum learned that MMC engaged in a fraudulent and illegal scheme to increase its overall Medicare, TennCare (Medicaid), Veterans Administration ("VA"), and private insurance billing and to meet the requirements of several state and/or federal grants. MMC's fraudulent and illegal scheme included (1) assigning inaccurate billing codes to medical procedures and treatments to increase reimbursement or meet grant requirements, (2) billing for medical services not provided, (3) failing to submit proper billing for a service provided by a teaching physicians, (4) providing unlawful remuneration to increase patient enrollment in violation of the federal Anti-Kickback statute, and (5) engaging in other illegal practices

2

to increase billing and to meet the requirements of several federal and/or state grants.

2. MMC's standard procedures, continuous actions, and ongoing scheme to defraud Medicare, TennCare (Medicaid), VA, and artificially meet grant requirements caused it to submit false claim for reimbursement to the United States and Tennessee in violation of the FCA and TFCA.

3. Laughbaum brought these fraudulent practices to the attention of her direct supervisor and a significant portion of MMC management. In response, MMC management threatened to terminate her employment if she did not take part in fraudulent billing practices.

4. MMC eventually terminated Laughbuam from MMC due to her continued refusal to take part in the fraudulent billing scheme.

5. Pursuant to 31 U.S.C. § 3730(b)(2), Laughbaum has provided the United States Attorney for the Middle District of Tennessee and Attorney General for the United States a copy of this Complaint and a written disclosure of substantially all material evidence and information in her possession.

6. Pursuant to Tenn. Code Ann. § 4-18-104(c)(3), Laughbaum has provided the attorney general and reporter of Tennessee a copy of this Complaint and a written disclosure of substantially all material evidence and information in her possession.

## II. PARTIES

7. Shirley Laughbaum is a citizen of the United States and a resident of Nashville, Tennessee. She is a certified professional coder under the

American Academy of Professional Coders and has over 14 years of experience in medical coding.

8.   MMC hired Laughbaum as a coding specialist in January 2015. As a coding specialist, Laughbaum reviewed medical records and patient charts to assign and ensure that the appropriate current procedural codes ("CPT codes"), Healthcare Common Procedure Coding System ("HCPCS"), and International Classification of Disease System codes ("ICD9 codes") were assigned to services submitted to and paid for by private insurance carriers, Medicare, TennCare (Medicaid), VA, private health insurance companies, and other governmental agencies. In addition, she was required to inform, interact, and coordinate with MMC staff and healthcare professionals to resolve coding and billing errors at MMC.

9.   Laughbaum performed her job duties pursuant to the appropriate federal, state, and local guidelines and laws despite pressure from MMC, including but not limited her immediate supervisor Angela Person-Hogan, to illegally code services for the benefit of MMC. As a result of not submitting to MMC's pressure, she was terminated for "security reasons" in June 2015.

10.   As a coding specialist, Laughbaum developed direct and independent knowledge of the fraudulent scheme described herein. Laughbaum is thus an original source of the facts and information set forth in this Complaint.

11.   MMC is a private nongovernmental Tennessee Corporation with a principal place of business and registered agent address at 1005 Dr. D.B. Todd

4

Jr Boulevard, Nashville, Tennessee 37208-3501. MMC's registered agent is Ivanetta Davis Samuels. MMC is a private medical college in Nashville, Tennessee dedicated to educating physicians, dentists, researchers, and health policy experts.

12.     MMC operates a teaching hospital, Nashville General Hospital, and has satellite clinics in the Nashville, Tennessee area including, the Meharry Comprehensive Health Building, the Meharry Medical Arts Building, Skyline Physicians Center, Meharry Sickle Cell Clinic, Meharry Dialysis Clinic, VA Primary Care, Elam Mental Health Center, Meharry Community Wellness Center, Meharry 12 South Community Clinic, and the Total Health Medical and Dental.

13.     Under the direction of MMC faculty and administrators, MMC's students and residents train and provide services at Nashville General Hospital at Meharry ("Nashville General"). Nashville General is the principle teaching hospital for MMC's clinical training. Nashville General is accredited by the Joint Commission on Accreditation for Healthcare Organizations. MMC promotes itself as one of the nation's top five (5) producers of primary care physicians.

14.     The Meharry Medical Group is part of and under the umbrella of MMC. Meharry Medical Group is the faculty practice plan and each of the approximately 114 Meharry Medical Group physicians hold a faculty appointment at MMC. Meharry Medical Group provides all of the professional services at Nashville General.

15.     Nashville General is owned by the Metropolitan Government of Nashville and Davidson County, Tennessee and provides Davidson County residents a wide array of healthcare services. Nashville General provides a wide range of acute care needs, including a post-operative surgical floor, medical floor, adult and neonatal intensive care units and full OB/GYN services.

### III.     JURISDICTION AND VENUE

16.     This action arises under the FCA, 31 U.S.C. §§ 3729-3733 and TFCA, Tenn. Code Ann. §§ 4-18-101-108. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises out of the laws of the United States, and supplemental pendant jurisdiction over the Tennessee state law claims pursuant to 28 U.S.C. § 1367.

17.     At all times material to this Complaint, MMC regularly conducted substantial business within the State of Tennessee, maintained permanent employees and offices in Tennessee, and continues to perform significant business activities within Tennessee. Accordingly, MMC is subject to personal jurisdiction in Tennessee.

18.     Pursuant to 31 U.S.C. §§ 3732(a), venue is proper in this district because MMC's principal place of business is in this District and it transacts business in this District.

### IV.     BACKGROUND

#### A.     Medicare, Medicaid, and TennCare Programs

19.     Medicare is a federal health insurance program for people who are elderly and certain disabled individuals. The United States Congress created Medicare in 1965 and it was adopted under 42 U.S.C. §§ 1395-1395lll. Medicare is the largest health insurance program in the United States and covers over 50 million people.

20.     Medicare is administered by a federal agency, specifically, the Centers for Medicare and Medicaid Services ("CMS").

21.     Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to agency established rates. 42 U.S.C. §§ 1395-1395lll.

22.     Medicare provides for care in or by a hospital under Medicare Part A ("Hospital Insurance Program"). 42 U.S.C. § 1395c-1395i-5. Medicare also provides for non-institutional doctors' services, outpatient care, medical supplies, and preventive services under Medicare Part B ("Medical Insurance"). 42 U.S.C. §1395j-1395w.

23.     Medicaid is a joint federal and state program that assists persons with limited income and resources with paying medical costs. In addition, it offers benefits not normally covered by Medicare, like nursing home care and personal care. It was also established in 1965 and adopted under 42 U.S.C §§ 1396-1396w-5.

24.     The Medicaid Program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. 42 U.S.C. § 1396a. The states then pay

doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to agency established rates. 42 U.S.C. § 1396(b).

25.     The Medicaid Program is jointly funded by the federal government and states. The federal government pays states for a specified percentage of program expenditures, called the Federal Medical Assistance Percentage. In 2015, the federal government paid approximately 65% of Tennessee's Medicaid Program's costs.

26.     TennCare is the state of Tennessee's Medicaid program. It provides health care to approximately 1.3 million Tennesseans and has an annual budget of approximately $10 billion. TennCare primarily covers low-income persons, pregnant women, children, the elderly, and those who have a disability. TennCare covers approximately 20% of the population, 50% of the births, and 50% of the children, in Tennessee. In 2015, approximately 140,552 Davidson County residents were enrolled in TennCare.

27.      In order to participate in the Medicare and Medicaid Programs, a healthcare provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS. 42 U.S.C. § 1395 (for Medicare) and 42 U.S.C. § 1396 (Medicaid). In order to participate in TennCare, a healthcare provider must enter into a contract with the Tennessee Commissioner of Finance and Administration. Tenn. Code Ann. §71-5-118.

28.     Under Medicare, the term "provider" includes a hospital that has in effect an agreement to participate in Medicare. 42 C.F.R. §400.202. In addition, the term "supplier" includes a physician or other practitioner and all other

8

entities other than a provider, that furnish healthcare services under Medicare. Id.

29. Under Medicaid, the term "provider" includes any individual or entity furnishing Medicaid services under an agreement with the Medicaid Program or engaged in the delivery of healthcare services and is legally authorized to do so by the state in which it delivers the services. 42 C.F.R. § 400.203.

30. Under TennCare, the term "provider" includes an appropriately licensed institution, facility, agency, person, corporation, partnership, or association that delivers health care services. Tenn. Comp. R. & Regs. 1200-13-13-.01.

31. Providers, Suppliers, and Vendors must comply with the requirements of the Medicare, Medicaid, and TennCare programs, in order to be eligible to receive payments from these programs for healthcare services, supplies or goods.

32. The Medicare Program requires institutional healthcare providers to file a Form CMS 855A enrollment application in order to qualify to receive payment benefits under Medicare. That application requires the provider to sign a certification that states in relevant part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited

9

to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

33.     The Medicare Program requires physicians and non-physician practitioners file a Form CMS 855I enrollment application in order to qualify to receive payment benefits under Medicare. That application requires the provider to sign a certification that states in relevant part:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

34.     TennCare requires providers to file a Provider Entity Application in order to qualify to receive payment benefits under TennCare/Medicaid Program. That application requires the provider to sign a certification that states in relevant part:

> Provider or Provider Entity will comply with all contractual terms, Federal and State regulations, rules, bulletins, policies and manuals, and MCO provider manuals and bulletins.
>
> ...
>
> Provider or Provider Entity understands and agrees that each invoice, claim or bill submitted by Provider or Provider Entity to TennCare constitutes a certification that Provider or Provider Entity has

10

complied with all applicable Medicaid laws, regulations and program instructions including but not limited to, the Federal anti-kickback statute and the Stark law, in connection with payment and the services provided under this Agreement.

35. Providers generally file their Medicare and TennCare (Medicaid) claims pursuant to the CMS Form 1500 (or HCFA) for services or CMS 1450 (or UB-04) for supplies and goods. Generally, these forms include language where the submitter of the form certifies that the information on the form is true, accurate, and complete and acknowledge that falsification of information is subject to prosecution under applicable state and federal law.

36. Medicare and TennCare (Medicaid) programs have enabled low-income, elderly, and disabled patients access to vital medical services. The solvency of these programs depends on providers limiting their billing to services provided to individuals eligible for benefits pursuant to program rules and regulations.

**B.    The Anti-Kickback Statute**

37. Federal laws and regulations governing Medicare and Medicaid, along with similar state statutes, prohibit entities like MMC from accepting or providing kickbacks to health care providers. Specifically, the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b)(1), operates to prevent the misuse of public funds by barring Medicare and Medicaid from paying for claims that are tainted by improper solicitations, payments or other remuneration from vendors to hospital providers. The AKS provides, in relevant part, that it is illegal to "offer or pay any remuneration . . . to induce [any] person . . . to

11

purchase, lease, order, or arrange for or recommend . . . any good . . . for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

### C. Vaccines for Children Program

38.     The Vaccines For Children ("VFC") program is federally funded through the Medicaid Program and provides vaccines at no cost to children who might not otherwise be vaccinated because of inability to pay. 42 U.S.C. §1396a(62). The Centers for Disease Control ("CDC") buys vaccines at a discount and distributes them to grantees. Typical grantees are state health departments and certain local and territorial public health agencies. Those grantees then distribute the vaccines to providers that enroll with the grantee VFC Program. The Medicaid Program established requirements for children to become eligible to receive and for providers to become eligible to administer the vaccines. 42 U.S.C. 1396s(a).

39.     The Tennessee Department of Health, through the Tennessee Immunization Program ("TIP"), participates in the CDC VFC Program. Tennessee healthcare providers may participate in the VFC program by completing a Provider Enrollment Profile and Agreement form.

40.     Vaccines in the VPC Program may only be used for eligible children. A child is eligible if they are under the age of 18 and meet one of the following categories: (1) uninsured; (2) enrolled or eligible for TennCare (Medicaid), even if the child has other primary insurance; (3) American Indian or Alaskan Native; or (4) underinsured, i.e coverage does not cover vaccines or

only at an elevated dollar amount. Providers must complete the CDC Patient Eligibility Screening Record for each vaccine and keep the record for three (3) years. Providers must receive specific authorization from the Tennessee VFC Program to use a vaccine on an ineligible patient.

41. Providers that receive vaccines through VFC must keep track of vaccines online or through the Tennessee VFC Program Vaccine Dose Accountability Report ("VDAR") and complete a VFC training program.

42. Through the Provider Enrollment Profile and Agreement form, VFC providers acknowledge and agree to: (1) administer VFC vaccines to eligible children only; (2) not charge for the cost of a VFC vaccine; (3) read the VFC program protocols and fully understand the requirement to maintain compliance with the VFC program.

43. Within the VFC program Requirements for Program Participation pamphlet, TIP provides the following examples of fraud and abuse: (1) providing vaccine to non-VFC eligible children; (2) selling or otherwise misdirecting VFC vaccines; (3) billing a patient or third party for VFC funded vaccines; (4) failing to screen patients for VFC eligibility; and (5) failing to account for VFC funded vaccines.

**D.    Veterans Health Administration Claims**

44. The Department of Veteran Affairs ("VA") provides nationwide healthcare services and benefits program for American veterans. Primarily, veterans seek healthcare at VA medical facilities. Non-VA medical care ("Purchased Care") is authorized under specific situations such as geographic

Case 3:15-cv-00661   Document 1   Filed 06/15/15   Page 13 of 30 PageID #: 13

inaccessibility, infeasible or uneconomic delivery of VA services. Once non-VA medical care is authorized by a VA provider, veterans may receive treatment from a registered non-VA medical care provider. 38 U.S.C. § 1703; 38 C.F.R. §§ 17.54-56.

45.     VA payment of purchased care is based on a system similar to that used in the Medicare Program. Once purchased care is authorized by the VA, the non-VA medical care provider submits Authorization and Invoice for Medical and Hospital Services ("VA Form 10-7078").

46.     In addition to VA Form 10-7078, claims submitted by a non-VA medical provider must include a CMS Form 1500 for services or CMS 1450 (or UB-04) for supplies and goods.

## V.     RELATOR'S ALLEGATIONS

47.     MMC engages in a pattern and practice of fraudulent billing of medical services, medical supplies, and medical goods at Nashville General and the MCC affiliated clinics through the Meharry Medical Group coding and billing department.

48.     In furtherance of its fraud, MMC instructed its medical coding professionals to submit claims with inaccurate, materially misleading, and fraudulent coding and information.

49.     Shortly after Laughbaum began working at MMC, she noticed irregularities and problems with the health records and corresponding CPT and ICD-9 coding.

50. On numerous occasions, Laughbaum brought coding issues to the attention of her direct supervisor, Angela Person-Hogan, Ross Fleming (Assistant Director of Operations), Julia Hamilton (Corporate Compliance Manager), Dr. Marquetta L. Faulkner, M.D. (Dean of the School of Medicine), and Mark Smith (Human Resources).

51. In return, Laughbaum was confronted with a hostile work environment and with a MMC administration that refused to change the fraudulent billing practices.

52. After refusing Ms. Person-Hogan's demand to use improper billing codes in early May 2015, Laughbaum was summoned to a meeting with Ms. Person-Hogan and Mr. Smith on very short notice. The topic of the meeting was Laughbaum's complaints regarding MMC's billing policies. As a result of Laughbaum's notifying MMC personnel of its fraudulent billing policies, Mr. Smith asked for Laughbaum's resignation. Over her objections and her refusal to resign, Mr. Smith dictated the terms of her resignation letter to Laughbaum.

53. Laughbaum left the meeting unsure of her status at MMC. Subsequently, Laughbaum received a COBRA payments letter from United Healthcare regarding her health insurance coverage post termination from MMC. Laughbaum contacted Mr. Smith and he informed her that the COBRA letter was in error. He stated that she was still employed at MMC.

54. While out of the office from April 9 to May 25, 2015. She did not have access to her MMC email account while out of the office. She regained access on June 1, 2015. Upon regaining access, she discovered other

15

individuals obtained access to her email on April 15th and forwarded spreadsheets to other MMC personnel's accounts. The spreadsheets contained information showing fraudulent billing practices of MMC.

55.     Laughbaum was required to attend interviews with Human Resources and then the Compliance Department. When she returned to work she was located in different office in the health records department and was not given access to her former computer or office. Her computer contains material information and documentation of MMC's fraudulent billing practices.

56.     Very shortly after returning to the office, her hours were changed to 8:00 am to 4:30 pm, which created a significant transportation problem for Laughbaum. Ms. Person-Hogan continued to harass Ms. Laughbaum and as a result, Laughbaum took sick leave to cope with the physical toll of the harassment.

57.     On June 7, 2015 at 7:22 pm, Mr. Smith emailed Laughbaum and told her to visit him at his office the following morning, the date she was set to return to work, before reporting to her desk.

58.     At that meeting, Laughbaum was informed that she was terminated for security reasons.

59.     Laughbaum believes MMC terminated her for notifying her superiors, co-workers, and the federal, state, and local authorities, about the fraudulent actions occurring at MMC and as set forth more specifically below.

**A.     Fraudulent Use of Vaccines Received Pursuant to the Vaccines for Children Program**

60.    Laughbaum came to know that MMC received vaccines from the VFC program. While performing her coding responsibilities she searched for a record of vaccines purchased by MCC. She was informed that MCC did not purchase vaccines but received them free of charge from the VFC program.

61.    Under the terms of the VFC program, MMC could only administer VFC vaccines to eligible children.

62.    On numerous occasions, Laughbaum reviewed records of claims submitted by MMC to private health insurance companies and self-pay patients for the costs of VFC vaccines. These charges were in addition to the charges for administering the injecting the vaccine.

63.    In addition, the VFC vaccines were used to vaccinate individuals that were ineligible under the VFC program, namely, those older than 19 years of age or those with health insurance. MMC billed private insurance companies for the cost of the improperly administered VFC vaccines.

64.    MCC received financial gain through the fraudulent administration of VFC provided vaccines. MMC's practices did not comply with its certification and representations in the VFC Provider Enrollment Profile and Agreement.

65.    Laughbaum brought these practices to the attention of Julia Hamilton. Laughbaum did not receive any instruction to stop billing private health insurers for VFC vaccines.

**B.    Fraudulent Billing of and Receipt of Reimbursement from Medicare, TennCare, and VA for Medical Services not Provided**

66.    In January 2015, Laughbaum was invited to participate in a MMC Pediatrics Department meeting. Most of the staff and physicians in the

17

Pediatrics Department were present at the meeting, including Dr. Xylina Bean. One of the topics of discussion was an audit of 500 records.

67. The discussion revealed that the only information contained within the 500 records was the patients' vitals and the dates of service. The records did not contain a chief complaint, SOAP (subjective, objective, assessment, and plan) notes, or diagnoses.

68. The Pediatric Department's remedy to this serious issue was to put at least a chief complaint so that months later the staff would have some facts to create and add SOAP notes and diagnoses to the record to enable billing.

69. Laughbaum raised several coding and billing issues during this meeting and was shouted down to the point she started to cry. Dr. Christopher Keefer, who also attended the meeting, comforted Laughbaum after the meeting and advised her that he was going to lodge a complaint over the way she was treated during the meeting.

70. Laughbaum viewed many records that did not have contemporaneously documented chief complaints, SOAP notes, and diagnoses. When she would catch these records months later during billing, information would be inserted into the records by providers.

71. The practice of only taking vitals and a date of service is an improper billing practice and leads to the fraudulent insertion of chief complaints, SOAP notes, and diagnoses months later.

72. Laughbaum found a correlation to between the records lacking chief complaints, SOAP notes, and diagnoses and the MMC facility at Skyline.

18

A significant portion of the inadequate records were generated at the Skyline facility.

73.     Initially, Laughbaum believed that this was coincidental but after she was informed of the "zip code grant", better known as the Racial and Ethnic Approaches to Community Health ("Reach") grant, the true purpose of the large number of inadequate records became clear.

74.     The "zip code grant" requires that a certain number of services be provided in the 37207 and 37208 zip codes. The MMC Skyline facility is located in zip code 37207 and a majority of these inadequate records were coded to these two zip codes.

75.     In addition, Laughbaum had numerous encounters with physicians and other non-physician providers who were improperly documenting records to produce more CPT 911211 codes rather than CPT 911213 or 911214 codes. In addition, obstetrics visits were not coded as such to produce more "zip code grant" eligible visits. It is believed that MMC needed a certain number of these codes to meet the "zip code grant" requirements.

76.     MMC's billing practices relating to "zip code grant" did not comply with it certifications and representations in the Medicare-Medicaid Enrollment Applications, TennCare Provider Entity Application, or CMS Forms 1450, 1500, and UB-04 and VA Form 7078.

77.     Laughbaum brought these "zip code grant" billing errors to the attention of Pediatric Department during a departmental meeting and she was

19

criticized so harshly that another physician thought it necessary to lodge a complaint.

**D. Fraudulent Billing of and Receipt of Reimbursement from Medicare, TennCare, and the VA for Teaching Physician Supervised Medical Services**

78.     While performing her job duties, Laughbaum noticed that medical services provided solely by MMC students and residents were coded under the teaching physicians national provider number. Teaching physicians can only seek reimbursement for services provided by a resident when the teaching physician is personally present with the patient, evaluated the patient, and involved in the plan of care.

79.     In a vast number of cases, the teaching physician's note and resident's note in the record did not justify billing through the teaching physician.

80.     MMC's billing practices relating to teaching physicians did not comply with it certifications and representations in the Medicare-Medicaid Enrollment Applications, TennCare Provider Entity Application, or CMS Forms 1450, 1500, and UB-04 and VA Form 7078.

**E.     Violations of the Anti-Kickback Statutes**

81.     MMC engaged in several fraudulent kickback schemes calculated to maximize enrollment of patients and, as a result, the amount of Medicare, TennCare (Medicaid), and VA reimbursement for their care. Had the government known that patients enrolled with MMC as the result of an illegal

20

kickback scheme, the government would not have provided reimbursement for the care of these patients.

82.     MMC provided illegal kickbacks to private practitioners by providing private practitioners with VFC vaccines and encouraging them to admit patients for care at MMC.

83.     Private practitioners could administer VFC vaccines free of charge and then submit a claim to private insurance companies for the cost of the vaccine.

84.     Another example of improper remuneration to physicians was an abuse of the self-referral procedures.

85.     The self-referral policy prohibits a physician from making a referral for health services to any entity with which he or she has a financial relationship.

86.     MMC physicians and administrators were in such a relationship when referring patients to each other and the satellite clinics associated with MMC. MMC was required to disclose and document such possible self-interest to the patient. MMC failed to properly disclose and document self-referrals.

**COUNT I**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT BILLING AND REIMBURSEMENT FOR VACCINES RECEIVED PURSUANT TO THE VACCINES FOR CHILDREN PROGRAM,**
**31 U.S.C. § 3729**

87.     Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

21

88.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a) relating to vaccines received pursuant to the terms of the VCF program.

89.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. § 3729(a) relating to the retention of monies arising out of the VCF program.

## COUNT II
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT BILLING, AND REIMBURSEMENT FOR MEDICAL SERVICES NOT PROVIDED TO PATIENTS
## 31 U.S.C. § 3729

90.     Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

91.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a) relating to the billing of healthcare services not provided to patients.

92.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or

knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. § 3729(a) relating to the retention of monies arising out of the billing of healthcare services not provided to patients.

**COUNT III**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS**
**FOR FRAUDULENT BILLING AND REIMBURSEMENT**
**FOR TEACHING PHYSICIAN MEDICAL SERVICES,**
**31 U.S.C. § 3729**

93.    Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

94.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a) relating to the improper submittal of claims for healthcare services provided by teaching physicians of MMC

95.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. § 3729(a) relating to the retention of monies arising out of the billing of healthcare services provided by teaching physicians of MMC.

Case 3:15-cv-00661   Document 1   Filed 06/15/15   Page 23 of 30 PageID #: 23

## COUNT IV
## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR
## VIOLATIONS OF THE ANTI-KICKBACK STATUTES,
## 31 U.S.C. § 3729

96.     Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

97.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a) relating to providing VFC vaccines and other remuneration to private healthcare providers.

98.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. § 3729(a) relating to the retention of monies received for VFC vaccines and other remuneration to private healthcare providers.

## COUNT VI
## VIOLATION OF THE RETALIATION STATUTE, 31 U.S.C. § 3730(H),
## AGAINST MEHARRY MEDICAL COLLEGE

99.     MMC retaliated against Laughbaum by terminating her because she would not create fraudulent documents stating that patients received care that they did not receive or that contained materially incorrect information regarding treatment. This discharge was in violation of 31 U.S.C. § 3730(h).

24

100. As a direct and proximate result of this unlawful and discriminatory discharge, Laughbaum has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with his efforts to obtain alternative employment, in an amount to be proven at trial.

**COUNT VII**
**TENNESSEE FALSE CLAIMS ACT VIOLATIONS FOR FRAUDULENT BILLING AND REIMBURSEMENT FOR VACCINES RECEIVED PURSUANT TO THE VACCINES FOR CHILDREN PROGRAM,**
**Tenn. Code Ann. §§ 4-18-101 *et seq.***

101. Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

102. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Tennessee Government for payment or approval in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to vaccines received pursuant to the terms of the VCF program.

103. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Tennessee Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the retention of monies arising out of the VFC program.

25

**COUNT VII**
**TENNESSEE FALSE CLAIMS ACT VIOLATIONS**
**FOR FRAUDULENT BILLING, AND REIMBURSEMENT**
**FOR MEDICAL SERVICES NOT ACTUALLY**
**Tenn. Code Ann. §§ 4-18-101 *et seq.***

104.  Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

105.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Tennessee Government for payment or approval in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the billing of healthcare services not provided to patients

106.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Tennessee Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the retention of monies arising out of the billing of healthcare services not provided to patients.

**COUNT IX**
**TENNESSEE FALSE CLAIMS ACT VIOLATIONS**
**FOR FRAUDULENT BILLING AND REIMBURSEMENT FOR**
**BILLING FOR TEACHING PHYSICIAN SUPERVISED MEDICAL SERVICES,**
**Tenn. Code Ann. §§ 4-18-101 *et seq.***

107.  Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

26

108. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Tennessee Government for payment or approval in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the improper submittal of claims for healthcare services provided by teaching physicians of MMC.

109. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Tennessee Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the retention of monies arising out of the improper submittal of claims for healthcare services provided by teaching physicians of MMC.

**COUNT X**
**TENNESSEE FALSE CLAIMS ACT**
**VIOLATIONS FOR VIOLATIONS OF**
**THE ANTI-KICKBACK STATUTES,**
**Tenn. Code Ann. §§ 4-18-101 *et seq.***

110. Laughbaum re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

111. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Tennessee Government for payment or approval in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to providing VFC vaccines to private healthcare providers.

27

112.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Tennessee Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of Tenn. Code Ann. §§ 4-18-101 *et seq.* relating to the retention of monies received for VFC vaccines.

**COUNT XII**
**VIOLATION OF THE RETALIATION STATUTE**
**AGAINST MEHARRY MEDICAL COLLEGE**
**Tenn. Code Ann. §§ 4-18-105**

113. MMC retaliated against Laughbaum by terminating her because she would not create fraudulent documents stating that patients received care that they did not receive or that contained materially incorrect information regarding treatment. This termination was in violation of 31 U.S.C. § 3730(h).

114. As a direct and proximate result of this unlawful and discriminatory termination, Laughbaum has suffered emotional pain and mental anguish, together with serious economic hardship, including lost wages and special damages associated with her efforts to obtain alternative employment, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Laughbaum requests that judgment be entered against Defendants, ordering that:

Case 3:15-cv-00661   Document 1   Filed 06/15/15   Page 28 of 30 PageID #: 28

A.     Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-33, and the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 *et seq.*;

B.     Defendant prays for not more than $10,000 for each violation of the Federal False Claims Act and Tennessee False Claims Act, plus three times the amount of damages the United States and Tennessee have sustained because of Defendants' actions;

C.     Laughbaum be awarded the maximum "relator's share" and "Qui Tam Plaintiff share" allowed pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 4-18-104;

D.     Laughbaum be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d); and Tenn. Code Ann. §§ 4-18-104;

E.     Laughbaum be awarded compensatory and punitive damages, costs, including attorney fees, for her wrongful termination pursuant to Tenn. Code Ann. §§ 4-18-105and 31 U.S.C. § 3730(H); and

E.     The United States and Relators be awarded such other relief as the Court deems just and proper.

Respectfully submitted by:

WATKINS & McNEILLY, PLLC

By: _____
    Samuel R. Helmbrecht, No. 23683
    214 Second Avenue North, Suite 300
    Nashville, TN 37201-1638
    615.255.2191
    615.242.0238 (fax)
    sam@watkinsmcneilly.com

*Attorney for Plaintiff Shirley Laughbaum*